**Patricia M. COX, Plaintiff,**

v.

**Joseph M. QUIGLEY, Defendant.**

**Civ. No. 87–377–B–H.**

United States District Court,
D. Maine.

March 23, 1992.

---

Jed Davis, Jim Mitchell & Jed Davis, P.A., Augusta, Me., for plaintiff.

Lewis V. Vafiades, Amy L. Faircloth, Vafiades, Brountas & Kominsky, Bangor, Me., for defendant.

## ORDER ON DEFENDANT QUIGLEY'S MOTION TO VACATE DEFAULT JUDGMENT

HORNBY, District Judge.

Where is the dwelling house or usual place of abode of a young person who has recently graduated from college, has left home and is serving on board ship in the Military Sealift Command for most of the year and spends his time off visiting various relatives and vacationing in different parts of the country or abroad? That is the question on this motion to vacate default judgment. Concluding that at the time service was attempted the defendant had no dwelling house or usual place of abode except perhaps for his ship, I find that the plaintiff failed to make proper service of process under Fed.R.Civ.P. 4(d) when the process server left the papers with the defendant's father at his parents' home. As a result, the court never obtained personal jurisdiction over the defendant and the default judgment must be vacated.

Growing up, Joseph Quigley lived with his family on Cayuga Heights Road in Ithaca, New York. He attended Maine Maritime Academy in Castine, Maine and graduated in the spring of 1987. Earlier that year, his parents moved to a new house in Ithaca on Iradell Road where there was no bedroom for their son. When he returned to Ithaca after graduation and took a summer job, Quigley slept on a cot in the basement. In the fall of 1987, he obtained a position with the Military Sealift Command and went to sea. In May, 1988, he notified his employer that he was changing his address to Florida, specifically Port Richie, his grandparents' address. At the same time he registered to vote in Florida and proceeded to cast a Florida absentee ballot. He has only voted once. He also filed his federal income tax return listing a Florida address in May, 1988. All of these

events occurred before the relevant developments in this lawsuit.

In June, 1988, the plaintiff's lawyer attempted to serve process on Quigley in connection with this lawsuit. The plaintiff's lawyer had a sheriff deliver the process to Quigley's parents' home on Iradell Road in Ithaca. Quigley's father, who has the same first name and middle initial as his son, declined to accept the process after determining that the lawsuit did not involve him. He told the deputy sheriff that his son was at sea for several months. The lawyer's secretary next wrote the deputy sheriff to determine if Quigley's parents' home was his usual place of abode and, if so, to leave the process there. This time the deputy sheriff left the process with Quigley's father and apparently also sent a copy by mail. Quigley's father took the process to his own lawyer who returned it by mail to the plaintiff's lawyer informing him that Quigley did not reside with his father and that his father did not accept service on his behalf.

■ Rule 4(d)(1) provides that service can be made upon an individual by serving him personally "or by leaving copies [of the summons and complaint] at the individual's dwelling house or usual place of abode...." The issue, therefore, is whether Iradell Road was Quigley's dwelling house or usual place of abode in June, 1988. The parties also presented evidence to me concerning events that occurred after June, 1988. My decision is limited to Quigley's status as of June, 1988. Nevertheless, his later activities may shed light on what took place earlier and may also affect his credibility.

■ Quigley's later activities include the following: He continued to hold his New York driver's license until it was stolen from him in Greece in the summer of 1988. On October 14, 1988, Quigley obtained a replacement Virginia license while his ship was in port in Norfolk, Virginia. Apparently Virginia makes such licenses available to nonresidents because of the large number of Navy personnel stationed there. The Virginia license listed New York as Quigley's residence. I draw no conclusions

from these driver's licenses. The original New York license did not expire until March, 1989, and it is not unusual that a graduating college student in the process of locating a job and ultimately a place to live does not immediately obtain a new driver's license. The apparent New York residence on the Virginia license is also explainable as a reference to the pre-existing New York license.

Quigley arranged for his grandmother in Florida to forward all his financial and business mail to his mother in New York and gave his mother a power-of-attorney. His mother was the joint account holder of his bank accounts and paid his bills. Through his father, a real estate broker, Quigley engaged in real estate transactions, buying a house, accepting a mortgage and renting property. All the documents reflecting these transactions listed Iradell Road as his address. I draw no conclusion from the real estate transactions carried on by Quigley's parents in his absence. His parents would logically use their own New York address for ease of payments.

When Quigley was arrested for OUI in Maine in the spring of 1989, he gave both his sister's Maine address and his ship as his address. During leave periods, Quigley spent approximately equal amounts of time with his parents, his grandparents and his sister. Most of his leave time was spent elsewhere, however, such as Virginia or Brazil. When Quigley upgraded his Coast Guard license in April, 1989, he gave his Iradell Road address. Most of Quigley's employment-related documents were addressed to the Florida address. His federal tax returns filed in 1989 and 1990 listed Florida as his address. Quigley maintains that when his mother became seriously ill he moved back to Iradell Road in late 1990. His New York driver's license issued on August 30, 1991, lists Iradell Road as his address but his interrogatory answers signed in this case on September 3, 1991, list Florida as both his residence and post office address.

In fact, I do not find Quigley to be a particularly credible witness when it comes

to statements about his dwelling house and place of abode or about his contacts with New York. Several of his previous statements in affidavits or interrogatory answers were equivocal or made material omissions in failing to reveal that his financial mail was forwarded by his grandmother unopened to his mother in New York, in understating the number of times he visited Ithaca and in later referring to his residence as Florida when he had already changed it back to New York. Confronted with the default in this lawsuit, I conclude that Quigley has been at best cavalier in his statements seeking to avoid the default judgment. Nevertheless, many of the factors that control my decision whether Iradell Road is his dwelling house or usual place of abode are based on documentary evidence and, in many cases, predate his notice of the lawsuit.

█ I conclude from the evidence that Quigley's goal in May, 1988, was to change his tax residence to Florida in order to avoid New York income taxes. Although tax residence alone is not determinative of the location of a dwelling house or usual place of abode, I conclude for that and other reasons that Quigley was no longer dwelling or maintaining a usual place of abode at Iradell Road in Ithaca, New York by June, 1988. The obvious purpose of Rule 4(d)(1)'s provision for service upon a responsible person at a defendant's dwelling house or usual place of abode is to provide some assurance that timely notice of the lawsuit will reach a defendant who has not been served personally. Leaving the process with a responsible person where the defendant is living is a good way to accomplish this objective. But in no sense was Quigley dwelling at Iradell Road or maintaining a place of abode there any longer in June, 1988. He had left home the fall after graduation and had taken up a new tax and voting residence. He maintained only a minimal connection to his parents' home. Quigley visited Iradell Road only briefly and treated his parents on his off-duty time to the same share of his time as his sister and grandmother. His grandmother at his Florida address forwarded certain categories of mail to his mother. But Quigley's parents had no effective way of reaching him at sea except through the Red Cross in case of a medical emergency. Thus, Iradell Road was not a location where process would reach Quigley in a timely manner. Quigley's father told the deputy sheriff that Quigley no longer lived there and the lawyer's letter to the plaintiff's lawyer confirmed the situation.

By the same token, I do not suggest that Florida had become Quigley's dwelling or usual place of abode. Quigley had no particular connection with his grandparents' house except the ability to sleep there when he was in the United States, a privilege he seldom used after May, 1988, and to use the address for his mail and to have his grandmother forward financial and business mail to his mother. He was obviously not dwelling there or maintaining an abode in Florida. If Quigley had a dwelling house or usual place of abode in June, 1988, it was his ship while he was not on leave. I do not mean to suggest that the ship furnished the plaintiff with an attractive option for service. As Quigley testified, he was often at sea for months at a time in the Military Sealift Command and his destinations and the dates of returning to port were often secret. I recognize that Rule 4(d)(1) is designed to provide plaintiffs an alternative method to serve a defendant who is avoiding personal service. Its permission for service at a dwelling house or usual place of abode is probably based on the assumption that these are usually not quickly or easily moved. Therefore, even though a defendant may avoid the process server in person, some other responsible person in the house can receive the papers. Courts and commentators have referred to our society's mobility and affluence as grounds for enlarging this method of service by recognizing that defendants may have two or more dwelling houses or places of abode for purposes of service. *See, e.g., National Development Co. v. Triad Holding Corp.,* 930 F.2d 253, 257 (2nd Cir.1991); 4A Wright & Miller, *Federal Practice and Procedure* § 1096 at 79–80 (2nd ed. 1987). But there is a limit to the scope of this

service option. Unfortunately, our mobile and affluent society has a large number of transient or homeless people. For them, there may be *no* dwelling house or usual place of abode. Although they are not the object of a lawsuit as frequently as the affluent, the Rule's language covers all categories. The last shelter at which a homeless person slept will often not furnish reasonable assurance that process will reach the defendant. For such defendants service at the dwelling house or place of abode is unavailable; personal service may be a plaintiff's only option then, no matter how difficult.

 Quigley, of course, was not homeless. He was, however, transient. As the plaintiff has conceded, it is her burden of proof to show that Iradell Road in Ithaca was his dwelling house or usual place of abode in June, 1988. I conclude that under the circumstances here that was no longer the case. Quigley had graduated from college, left home, found a job, obtained a new tax residence, voted in a different state, and maintained employment records with a new Florida address. Although he used his parents' address in some other respects, such as to obtain financial documents and have his mother manage his financial affairs (there is no suggestion that the power-of-attorney authorized her to accept service of process or answer a complaint), and although his behavior with his driver's and Coast Guard licenses was inconsistent, I conclude that these factors are not sufficient to show that he was dwelling or maintaining a place of abode at Iradell Road. This conclusion may mean that it will be difficult for plaintiffs to serve some highly mobile or transient defendants. But ease of service cannot displace the need to find a method that will reasonably assure timely notice of the lawsuit.

Finally, the plaintiff has not satisfied me that Quigley had timely notice of this lawsuit. Although it seems incomprehensible that Quigley's father did not notify him of the lawsuit even later when he ultimately did visit home, family and father-son relationships encompass many possibilities. I do find credible Quigley's parents' failure

to contact him while he was at sea given the difficulties of using the mail and ship-to-shore phone with a person in the Military Sealift Command.

Default judgment is therefore VACATED. The Clerk's Office shall schedule a conference of counsel (by telephone or in person) in approximately thirty (30) days to discuss further proceedings.

SO ORDERED.